**FAIR et al. v. MILLER et al.**
No. 4595.

Court of Civil Appeals of Texas. Texarkana.
March 16, 1934.

Rehearing Denied March 22, 1934.

Pollard, Lawrence & Lux, of Tyler, and C. J. Brannan, of Wichita Falls, for appellants.

Tom L. Beauchamp and Wm. Frank Bezoni, both of Tyler, for appellees.

LEVY, Justice.

On January 13, 1933, this suit was filed by the appellees against R. W. Fair, C. L. Thompson, and Fair & Thompson, a corporation, the Producers' Supply & Tool Company, the Burk Royalty Company, a partnership, in the purpose to remove an apparent cloud from title to realty cast by reason of recording an instrument purporting to be a gas and oil lease of land, and for damages. As ground of remedy: "Plaintiffs allege that the instrument in writing herein pleaded is ineffective as an instrument of conveyance; that it was nothing more than an executory contract signed by the parties and left in the possession of the attorneys who drew it and was never delivered, but was held pending acceptance of title by defendants, and that long after they had forfeited all rights thereunder by declining to accept the title as it was, the defendants Fair and Thompson secured a copy of the instrument and are claiming rights thereunder, and have placed same of record and thereby cast a cloud upon plaintiffs' title to said oil and gas lease, and have damaged plaintiffs in the reasonable sum of $100,000.00." The petition further specially set up a state of facts in breach of the terms of agreement and of invalidity of the instrument, in the purpose of warranting the relief prayed for. The Producers' Supply & Tool Company and the Burk Royalty Company were named defendants as claiming some character of interest in the lease or lien on the property.

The defendants Fair and Thompson, individually and corporate, answered by general denial, and specially that they were not in default of the terms of the agreement and that they acted without delay and expended money in effort to cure objections to title, and any delays therein were occasioned by re-

quests and demands of plaintiffs to await efforts to clear up the title to the land. Further acts and conduct in estoppel were set up. By way of cross-action damages were sought to be recovered for alleged injuries to the defendants.

The defendants Burk Royalty Company and Producers' Supply & Tool Company answered pleading acquisition of an interest in the property as innocent purchasers.

In keeping with the answers of the jury to special issues, judgment was entered in favor of the plaintiffs and canceling the instrument in suit, and against the defendants and denying a recovery on their cross-action. The defendants have appealed from the judgment.

The instrument, which is the basis of this suit, reads:

"State of Texas, County of Smith.

"Whereas, on August 11, 1925, Mrs. Daisy M. Bradford made, executed, acknowledged, and delivered to C. M. Joiner, Trustee, a certain oil, gas and mining lease covering 100 acres of land, more or less, in the Juan Ximines Survey in Rusk County, Texas, said lease being recorded in Volume 126, page 132, Deed Records of Rusk County, Texas, reference to which is here made for all purposes; and,

"Whereas, on November 22, 1929, C. M. Joiner, Trustee, did subdivide and plat said oil, gas and mining lease and file same for record on November 23, 1929, as recorded in Volume 140, page 626, Deed Records of Rusk County, Texas; and

"Whereas, on August 11, 1930, Mrs. Daisy M. Bradford did make, execute, acknowledge, and deliver to C. M. Joiner, Trustee, an extension agreement extending the time of said lease for thirty days, said extension agreement being recorded in Volume 148, page 411, Deed Records of Rusk County, Texas, reference to which is here made for all purposes; and,

"Whereas, on August 15, 1930, Mrs. Daisy M. Bradford did execute a second extension agreement to C. M. Joiner, Trustee, extending the date of said lease for a period of thirty days from midnight of September 11, 1930, and so much longer as oil, gas, or either of them, is being produced in paying commercial quantities from said lease, said extension agreement being recorded in Volume 149, page 524, Deed Records of Rusk County, Texas; and,

"Whereas, on August 11, 1930, C. M. Joiner, Trustee, did sell, assign, transfer and convey to H. C. Miller all of that certain oil, gas and mining lease, together with all rights, title and interest of the original lessee and present owner in and to all rights thereunder insofar as it covers all of 100-3/4 acres of land in two tracts, and being described as follows, to-wit: (Here follows description of the land.)

"Said assignment being recorded in Volume 148, page 419, Deed Records of Rusk County, Texas, reference to which is here made for all purposes; and,

"Whereas, the said H. C. Miller is now the owner of said oil, gas and mining lease above described insofar as it covers Block No. 5 and the West one-half of Block No. 6 of the C. M. Joiner Subdivision of the Mrs. Daisy M. Bradford oil, gas and mining lease, as per plat recorded in Vol. 140, page 626, Deed Records of Rusk County, Texas, together with all personal property situated thereon, said land being more particularly described as follows, to-wit: (Here follows description.)

"And, Whereas, it is the desire of the said H. C. Miller, joined by his wife, Oralie Miller, and Mrs. Daisy M. Bradford, hereinafter known as assignors, to sell, transfer, assign, set over and convey to R. W. Fair and C. L. Thompson, hereinafter known as assignees, said oil, gas and mining lease covering said above described tracts of land insofar as it covers six-eighths of all the oil, gas and other minerals in, under and that may be produced from said above described 67 acres of land.

"Now, therefore, know all men by these presents:

"That I, H. C. Miller, joined by my wife, Oralie Miller, and Mrs. Daisy M. Bradford, a feme sole, of the County of Smith and State of Texas, do hereby sell, assign, transfer, set over and convey unto the said R. W. Fair and C. L. Thompson, of the County of Smith and State of Texas, said above described oil, gas and mining lease insofar as it covers six-eighths of all the oil, gas and other minerals in and under and that may be produced from said 67 acres of land situated in Rusk County, Texas, in consideration of the payment by assignees to assignors of the sum of Twenty Thousand One Hundred ($20,100.00) Dollars out of the first one-eighth of all the oil and/or gas produced, saved and marketed from said above described lease, subject, however, to the provision that assignees may pay to assignors, within six months from the commencement of the drilling of the first well as hereinafter provided, the sum of

Six Thousand Seven Hundred ($6,700.00) Dollars; and, in the event the said sum of Six Thousand Seven Hundred ($6,700.00) Dollars is paid to assignors within said six months period of time, then and in that event, the said sum of Six Thousand Seven Hundred ($6,700.00) Dollars, less the money already received out of the payment of one-eighth of the oil and/or gas above mentioned, shall be accepted by assignors, their heirs, successors, as full payment of the said sum of Twenty Thousand One Hundred ($20,100.-00) Dollars to be paid out of the first one-eighth of all the oil and/or gas produced, saved and marketed from said lease; and upon the payment of the said sum of Six Thousand Seven Hundred ($6,700.00) Dollars Assignors bind and obligate themselves to release the said first one-eighth of the oil and/or gas produced, saved and marketed from said lease from which said sum of Twenty Thousand One Hundred ($20,100.00) Dollars is to be paid to assignors upon the following terms, conditions, and stipulations, to-wit:

"1. Assignors hereby agree to warrant and defend the title to said land against any persons whomsoever lawfully claiming or to claim the same, or any part thereof, and further bind and obligate themselves to deliver to assignees a good and merchantable title to said land.

"2. It is agreed and understood that the abstract of title to said above described tract of land certified to this date has been delivered by assignors to assignees for examination and approval of title; that assignees shall have five days from this date to examine and deliver to assignors an opinion concerning the title to said land pointing out to assignors defects of title, and assignors shall have thirty days from the receipt of said opinion in which to cure the defects so pointed out and meet such requirements as assignees shall make, after which time, assignees may have a reasonable length of time within which to do such curative work as has not been completed by assignors. In the event an examination of title by attorneys for assignees discloses that assignors' title to the land, or any part thereof, covered by this assignment, is, at the expiration of the time so allowed, still unsatisfactory to assignees' attorneys, or is encumbered to the prejudice of this assignment, then and in that event, assignees shall have the right, at their option, to either reject or accept the entire lease assigned, or any part thereof, and in case of rejection of all or any part of said lease, then assignees shall assign to assignors the part of said lease whose title is not accepted; provided, however, that the assignor shall receive only such proportion of the consideration recited herein as same bears to the number of acres accepted. In the event title to said land is not accepted, then no liability shall exist as to either party against the other party hereto, and assignees shall reassign the interest herein assigned to assignors.

"3. Assignees bind and obligate themselves, to, at their own proper cost and expense, begin operations for the drilling of an oil and/or gas test well upon said above described tract of land within fifteen days after a good and merchantable title shall have been approved and accepted by assigns, a good and merchantable title to said lease, acceptable to assignees, then and in that event, assignees, their heirs, successors or assigns, bind and obligate themselves, as a part of the consideration for the execution of said oil, gas and mining lease, to, within fifteen days after the delivery of a good and merchantable title to said land, at their own proper cost and expense, erect a derrick and place a rotary drilling rig, in good condition, upon the above described lease, and begin the actual drilling of an oil and/or gas test well upon said above described tract of land, with standard rotary drilling equipment; and shall, at their own proper cost and expense, continue, without interruption or delay, in good faith, except if prevented by acts of God or other persons beyond the control of the assignees, their heirs, successors, or assigns, to drill, at their own proper cost and expense, said oil and/or gas test well on said above described tract of land until said well shall have been drilled to a depth of 3700 feet unless oil and/or gas shall have been encountered in paying commercial quantities at a lesser depth without cost to assignors. In the event oil and/or gas shall have been encountered in paying commercial quantities in said first well to be drilled upon said above described tract of land, then and in that event, assignees, their heirs, successors, or assigns, shall, within thirty days after oil and/or gas shall have been encountered in paying commercial quantities in said first well, at their own proper cost and expense, begin the operations for the drilling of a second oil and/or gas test well upon said above described tract of land in the manner provided above, and shall continue the drilling of same in the manner provided for the drilling of the first well; and shall, within thirty days after oil and/or gas shall have been found in paying commercial quantities

in said second well, begin the operations for the drilling of a third oil and/or gas test well upon said above described tract of land, and shall continue the drilling of same in the manner provided for the drilling of said first well.

"4. In the event assignees elect to perform the terms and conditions of this contract and do not assign same to assignors, as provided hereinafter, then and in that event assignees, their heirs, successors, or assigns, in the performance of said contract, bind and obligate themselves to, at their own proper cost and expense, furnish a derrick or derricks, surface casing, cement, water, gas, fuel, rig, two-inch upset tubing, separator, all labor, drill pipe casing, and other pipes, and each and every kind of equipment or necessary appliances for the drilling of said well or wells, including storage tanks or tank, run-ways and separators, together with all other and further appliances, pipes, fittings, etc., necessary to completely install and equip same, including dikes built around storage tanks. Assignees, their heirs, successors or assigns, bind and obligate themselves to, at their own proper cost and expense, drill said wells in the manner and at the times above required; that they will carry, at their own proper cost and expense, compensation insurance, public liability and property damage insurance, and any and all other forms of insurance necessary to fully protect assignors, their heirs, successors or assigns, from any and all liability which may or might arise in the full, complete and faithful performance of this contract; and assignees, their heirs, successors, or assigns further bind and obligate themselves to hold assignors herein harmless from any and all liability of any nature whatsoever which may or might arise or grow out of the full and complete performance of this contract. Assignees, their heirs, successors or assigns, further bind and obligate themselves that they will, at their own proper cost and expense, drill any and all other wells necessary to take care of producing off-set wells on said above described tract of land.

"5. That all of the above terms and conditions of this contract are made subject to the following agreement, to-wit: That time is the essence of this contract, and in the event assignees fail or refuse to complete the drilling of the first well or any other well to be drilled thereon, and desire to abandon the drilling of said well and/or the operation of said lease, then and in that event assignees shall convey to assignors the leasehold rights herein conveyed, together with any property situated thereon or used in connection with the drilling of said well, and all work, labor, and materials furnished in the drilling of said well, and/or in the operation of said lease, which are owned by assignees, free and clear of any liens and encumbrances, save and except such assignments of interest of oil payments which have been made by assignees for costs and expense of the drilling of said well or wells, which said oil payments, if any, shall be paid only out of assignees' portion of the oil produced, saved and marketed from the well or wells so drilled and completed, which said assignments shall release assignee from any and all liability of any nature whatsoever incurred in and under the terms of this contract.

"6. Assignees, their heirs, successors, or assigns, shall have the exclusive right to operate said property above described, according to the terms of said lease above referred to.

"It is agreed and understood and made a part of the consideration for the execution of this agreement that, in the event the first well drilled by assignors does not produce oil and/or gas in paying commercial quantities, then and in that event, assignees may assign to assignors the lease interest herein conveyed, free and clear of any liens and encumbrances, and no liability shall exist as to either party herein, in the event assignees desire so to do; however, should assignees desire to drill a second well, they may do so at their option, and may continue to perform the terms and conditions of his agreement.

"Witness Our Hands and Signatures at Tyler, Texas, this the 11th day of May, A. D. 1932."

This instrument was duly signed and acknowledged by both the assignors and Fair and Thompson, assignees; and was filed for record November 25, 1932.

Upon the execution of the above instrument, a certified abstract of title to the tract of land described was delivered by assignors to the assignees for examination. The assignees had the abstract of title examined within the five-day period, and the written legal opinion thereupon, which was delivered by the assignees to the assignors, recited "that the abstract reflects that H. C. Miller has a good and merchantable title to that certain 7/8" oil, gas and mineral lease in the Daisy Bradford tract of land, subject to the following limitations, to-wit: (Here follows forty-eight specified "exceptions" or defects.) The assignors then presented a certified supplemental abstract of title, and the written

legal opinion thereupon was delivered by the assignees to the assignors. The written legal opinion recites: "We have examined the above supplemental abstract of title covering an additional 34 pages, and in addition to the forty-eight exceptions to the title as pointed out in our original opinion we find the following exceptions to the title, to-wit:" (Here follows twenty-six "exceptions" or defects.) There is evidence going to show that for greatly more than thirty days the assignors made due and continuous effort to clear the title and meet the exceptions as pointed out, but were unable to do so. There is further evidence that Mr. Miller acting for the assignors made many trips to various places in the effort to obtain needed instruments to cure the defects of title pointed out. Mr. Thompson, one of the assignees, accompanied Mr. Miller on some of the trips. There is also evidence that the assignees in individual and independent efforts tried diligently to cure some of the defects of title pointed out.

It was shown by evidence that in December, 1932, the assignees built a derrick on the land, and then began drilling an oil well and completed a flowing well, at a cost of some $11,000. Preparations were begun for the drilling of a second well and the drilling was prevented by this suit. There was evidence going to show that prior to the time of beginning the drilling of the first oil well Mr. Miller for assignors gave notice to the assignees of the intention of assignors to forfeit and to insist upon the forfeiture of the agreement of assignment of the lease. Mr. Miller testified that he notified the assignors through Mr. Fair that it was impossible to cure the title "without a lawsuit with old man Joiner" and "that he (Mr. Fair) turned it down" and "wouldn't accept it under those terms at all."

The evidence, which is only briefly stated and not in detail and at length, fully appears in the record and is here referred to.

The following issues were submitted to the jury and answered:

"No. 1. Do you find from a preponderance of the evidence in this case that the defendants paid the plaintiffs any consideration at the time of the execution of the contract dated May 11, 1932?" Answer: "No."

"No. 2. Do you find from a preponderance of the evidence in this case that it was contemplated by the parties to said contract dated May 11, 1932, that the defendants should pay the plaintiffs any consideration?" Answer: "Yes."

"No. 3. Do you find from a preponderance of the evidence in this case that the defendants expended any money in obtaining curative matter to perfect the title to the land in controversy in this suit?" Answer: "No."

"No. 5. Do you find from a preponderance of the evidence in this case that the defendants incurred expenses in the drilling of the oil well on the land in controversy in this suit?" Answer: "No."

"No. 8. Do you find from a preponderance of the evidence in this case that the plaintiffs, prior to the time defendants began drilling an oil well on the land in controversy in this suit, gave notice to the defendants of plaintiffs' intention to cancel said contract?" Answer: "Yes."

"No. 9. Do you find from a preponderance of the evidence in this case that the plaintiffs, either by act, word or conduct, agreed for the defendants to continue securing curative matter to perfect the title to the land in controversy in this suit up to the time they began drilling an oil well?" Answer: "No."

"No. 10. Do you find from a preponderance of the evidence in this case the plaintiffs, either by act, word or conduct, agreed for the defendants to place machinery on the ground and drill an oil well on the property in controversy in this suit?" Answer: "No."

"No. 11. Do you find from a preponderance of the evidence in this case that defendants did, after the expiration of the 30-day period allowed by the contract dated May 11, 1932, for the plaintiffs to cure the title, attempt to cure and perfect the title to the land in controversy in this suit?" Answer: "Yes."

"No. 12. Do you find from a preponderance of the evidence in this case that the defendants pursued the matter and cured the defects in the title, if any, to the property in controversy in this suit to their own satisfaction within a reasonable time?" Answer: "No."

"No. 13. Do you find from a preponderance of the evidence in this case that the plaintiffs used such diligence in attempting to clear the title to the land in controversy in this suit as a reasonably prudent person would have used under the same or similar circumstances?" Answer: "Yes."

"No. 14. Do you find from a preponderance of the evidence in this case that the plaintiffs instituted suit against defendants herein without cause?" Answer: "No."

"No. 15. Do you find from a preponderance of the evidence in this case that the defendants have been damaged by reason of filing such suit?" Answer: "No."

"No. 17. Do you find from a preponder-

ance of the evidence in this case that at the time the Burk Royalty Corporation purchased an interest in this property that it knew or could have known by the exercise of ordinary diligence, such as a reasonably prudent person would have exercised under the same or similar circumstances, of the claim or claims of the plaintiffs herein?" Answer: "Yes."

"No. 18. Do you find from a preponderance of the evidence in this case that at the time the Producers Tool and Supply Company purchased an interest in this property that it knew or could have known by the exercise of ordinary diligence, such as a reasonably prudent person would have exercised under the same or similar circumstances of the claim or claims of the plaintiffs herein?" Answer: "Yes."

There is evidence going to support the verdict of the jury, and the answers are adopted except as to issue No. 5.

■■ In view of the findings of the jury, the trial court correctly concluded, it is believed, that there was a failure of performance by the assignees of a condition vital to the main object of the agreement of the parties, and that the contract of sale or assignment of the lease was ended. The jury made the finding of fact that (1) the assignees "within a reasonable time" had not "pursued the matter and cured the defects in the title, if any, to the property in controversy in this suit to their own satisfaction." The parties by their contract expressly agreed that "assignees may have a reasonable length of time within which to do such curative work as has not been completed by assignors." This by the finding of the jury was not done. That in point of fact the assignees did not within the time provided to their satisfaction cure or obviate the defects of title pointed out by the written opinion of the attorneys. The timely performance by the assignees of the stipulated condition was vital to the main object of the agreement of the parties. Time was of importance, as known and contemplated by the parties, in the acceptance or rejection of the assignment of the oil lease of land situated in a producing oil field. The contract of the parties expressly stipulated as a "condition" to the assignment or sale of the lease that the assignors must "deliver to assignees a good and merchantable title to said land." The abstract of title, timely delivered by the assignors, was examined by the assignees' attorneys, a firm of competent lawyers. In a written opinion by them, evidencing carefulness of work and exceptional legal knowledge, objections are made to the title. which appear upon their face to be substantial. The assignors were unable, as proven, to remove all the objections to the title pointed out. The title tendered assignees suggested litigation. They were unable to convey a merchantable title as agreed. The assignees were not required to accept a title which they had been advised. was defective or suggested litigation. By the terms of the contract they were given a final. refusal or not to obviate the objections pointed out. They had stipulated that they should be given "a reasonable length of time," after the thirty-day period of time allowed the assignors to cure or obviate the objections pointed out, "within which to do such curative work as has not been completed by assignors." That such a stipulation is valid and will be enforced is not open to serious question. The assignees had no contractual right to demand an extension of time. And the findings of the jury further establish there was not waiver of delay or an extension of time to take steps in effort to cure or obviate defects in title pointed out. The jury made the findings of fact that (1) the assignors did not "either by act, word or conduct agree for the defendants to continue securing curative matter to perfect the title to the land in controversy in this suit up to the time that they began drilling an oil well," and (2) "the plaintiffs prior to the time the defendants began drilling an oil well on the land in controversy in this suit gave notice to the defendants of the plaintiffs' intention to cancel said contract." The principal contention is that of whether the provisions of the contract concerning the title were waived. In the facts the assignors were unable to show a good marketable title and the assignees had not acted within the time provided and cured or removed to their satisfaction the objections to the title pointed out. The breach or default of agreement to furnish a good marketable title in effect rendered the object sought to be effected not possible of accomplishment at least within the period of time stipulated, and the breach of both parties would operate as a discharge of the whole agreement, unless it is waived. The assignees were obligated either to take or not accept the title within the stipulated time. The right may not be predicated in the facts established by the jury to not terminate and to elect to enforce the agreement of sale of the lease and to drill an oil well on the land. The facts so established show that the stipulated time was not waived "either by acts, words or conduct," and "notice" was given of the intention of assignors to cancel or refuse to be bound by the agreement. The default or failure of terms of agreement of-

title as respects both the assignors and assignees took place while the contract was still executory, and before performance could be legally demanded.

There appear other assignments of error, which we have duly considered and have concluded should each be overruled as not warranting reversal. The evidence complained of was not improperly admitted. The issues submitted were pertinent and substantially presented the controversy to the jury for decision.

■ There is just complaint of the form of the judgment, and the judgment is here directed to be corrected in the respect of the elimination of the words complained of "as in their amended petition and supplemental petitions prayed for." Those terms might include recovery of a money judgment which was not in fact decreed by the court.

The judgment is affirmed.